ORIGINAL

Approved: _____
DANIEL H. WOLF
Assistant United States Attorney

Before:  THE HONORABLE ROBERT W. LEHRBURGER
         United States Magistrate Judge
         Southern District of New York

19MAG844

- - - - - - - - - - - - - - - - - - X
                                     :   SEALED COMPLAINT
UNITED STATES OF AMERICA             :
                                     :   Violations of
     - v. -                          :   18 U.S.C. §§ 1349,
                                     :   1343, and 2
THOMAS IRIGOYEN, and                 :
NICHOLAS OFEI COFIE,                 :   COUNTY OF OFFENSE:
                                     :   NEW YORK
              Defendants.            :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

   ANTHONY NAPOLI, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD") and a Task Force Officer with the United States Department of Homeland Security Financial Crime Task Force, and charges as follows:

COUNT ONE
(Conspiracy to Commit Mail and Wire Fraud)

   1.   From at least in or about December 2016, up to and including the present, in the Southern District of New York and elsewhere, THOMAS IRIGOYEN and NICHOLAS OFEI COFIE, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

   2.   It was a part and object of the conspiracy that THOMAS IRIGOYEN and NICHOLAS OFEI COFIE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, would and did place in a

post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom, such matters and things, and would and did knowingly cause to be delivered by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the person to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

3. It was further a part and an object of the conspiracy that THOMAS IRIGOYEN and NICHOLAS OFEI COFIE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Wire Fraud)

4. From at least in or about December 2017 up to and including at least in or about July 2018, in the Southern District of New York and elsewhere, NICHOLAS OFEI COFIE, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.      I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, on my conversations with other law enforcement officials, and on my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## The Schemes to Defraud

6.      Based on my participation in this investigation, my review of bank records, my review of materials obtained from victims, my personal involvement interviewing victims, my conversations with law enforcement agents, witnesses, and others, and my training and experience, I have learned the following:

   a.      From at least in or about December 2016 up to and including the present, THOMAS IRIGOYEN and NICHOLAS OFEI COFIE, the defendants, and others known and unknown, made false and misleading claims to individuals (the "Victims") which caused the Victims to send money and cryptocurrency by mail, private and commercial interstate carriers, and/or wire to IRIGOYEN, COFIE, and others known and unknown.

   b.      As part of the schemes to defraud, the defendants made at least two categories of false and misleading representations: (1) the "False Acting Job Misrepresentations"; and (2) the "False Romance Misrepresentations."

   c.      The False Acting Job Misrepresentations included, but were not limited to, the following representations made to Victims:

   i. Victims were contacted by email by an individual purporting to work for a production company and offering the Victims an opportunity to appear as an actor or model in an advertisement;

   ii. Victims were provided by email or mail a contract ("Fake Acting Contract") that falsely purported to offer the Victims an acting or modeling job in exchange for payment to the Victims, which the Victims were then persuaded to sign;

3

   iii. Victims were provided a fake check or money order ("Fake Financial Instrument") purportedly to provide the Victims with partial payment for their acting services but also to be used by the Victims to issue payment to a stylist or wardrobe consultant("Stylist") who would assist the Victims in preparing for the acting or modeling job offered to the Victims;

   iv. Victims were instructed via email and/or text message to deposit the Fake Financial Instrument into their own bank accounts and then to withdraw a sum of money, typically slightly less than $5,000, against the value of the Fake Financial Instrument to be used as payment to the Stylist; and

   v. Victims were instructed via email and/or text message to provide payment to the Stylist by transferring a sum of money withdrawn against the value of the Fake Financial Instrument to bank accounts, cryptocurrency accounts, or mailing addresses purportedly to provide payment to the Stylists.

  d. The False Romance Misrepresentations included, but were not limited to, misrepresentations to Victims via social media, email and text message that expressed a desire to enter a romantic relationship with the Victims and instructed the Victims to transfer a sum of money to a bank account purportedly in furtherance of a romantic relationship.

  e. As part of the schemes to defraud, the money that Victims were instructed to transfer was not, in fact, used to assist the Victims obtain acting or modeling jobs or find romance. Rather, the money transferred by Victims was used to personally enrich the defendants and others known and unknown.

  f. As part of the schemes to defraud, the defendants and others known and unknown engaged in extensive efforts to perpetuate and conceal the fraudulent scheme. These efforts included, but were not limited to, the use of fictitious aliases and businesses and the use of temporary phone numbers registered to masked Internet Protocol addresses.

## The False Acting Job Scheme

7.  Based on my review of documents created and mailed to certain of the Victims, my conversations with other law enforcement officers and other individuals (including Victims), and my review of documents (including bank records, commercial databases, emails, and text messages), and my training and experience, I have learned the following, in substance and in part:

   a.  Prior to on or about September 18, 2017, Victim-1, an aspiring actress, was contacted via electronic communication by an individual purporting to be "Alexander Santos" of "Bryanston Productions."

   b.  Victim-1 was promised an acting job by the individual purporting to be "Alexander Santos" and provided, via email, with a contract indicating that Victim-1 was to be provided with a check for $4,990.00 ("Check-1"), $440.00 of which was to serve as an upfront payment for her services as an actress, and the remaining $4,550.00 was to be used by a Stylist to assist in providing a wardrobe to Victim-1 for the acting job.

   c.  After Victim-1 received Check-1 and prior to on or about September 18, 2017, the individual purporting to be "Alexander Santos" instructed Victim-1 to deposit Check-1 into Victim-1's bank account, withdraw a quantity of cash against Check-1, and convert that cash into Bitcoin by depositing the cash into an automatic teller machine capable of converting cash into Bitcoin ("Bitcoin ATM") located in Manhattan.

   d.  Because Victim-1 did not feel comfortable converting the cash into Bitcoin, the individual purporting to be "Alexander Santos" instructed Victim-1 to deposit the cash into a bank account in the name of "Thomas Irigoyen" held with a national bank, Bank-1 ("Bank Account-1").

   e.  On or about September 27, 2017, from a bank branch in Manhattan, New York, Victim-1 deposited $4,550.00 into Bank Account-1.

8.  Based on my review of documents created and mailed to certain of the Victims, my conversations with other law enforcement officers and other individuals (including Victims), and my review of documents (including bank records, commercial databases, emails, and text messages), and my training and

5

experience, including but not limited to my training and experience in facial recognition techniques, I have learned the following, in substance and in part:

    a. Bank Account-1 was opened on or about November 17, 2016, in the name of "Thomas Irigoyen" with a home address that matches a home address in California listed as such by a commercial and government databases for THOMAS IRIGOYEN, the defendant.

    b. A surveillance photograph taken in or around 2017 by Bank-1 inside a bank branch in California of a male engaging in a bank transaction using Bank Account-1 at a bank counter depicts an individual whose appearance matches that of a government photograph of IRIGOYEN.

    c. After on or about September 27, 2017, Victim-1 was notified by her bank that Check-1 was fraudulent and that the bank would not honor it, leaving Victim-1 liable for the money she had withdrawn against the value of Check-1.

    d. On or about November 29, 2017 (approximately two months after Victim-1 deposited $4,550.00 into Bank Account-1), Bank-1 provided materials to IRIGOYEN educating him about currency transaction reporting obligations for financial institutions under the Bank Secrecy Act. A financial institution generally provides such education to customers suspected by the financial institution of engaging in money laundering or, at a minimum, as an unwitting conduit for money laundering.

    e. The money deposited into Bank Account-1 by Victim-1 was never returned to her or reported by IRIGOYEN to have been inadvertently received by him.

    f. Victim-1 never obtained employment from the individual purporting to be "Alex Santos."

9. Based on the facts set forth in the preceding paragraphs (¶¶ 8), and my training and experience, I believe that THOMAS IRIGOYEN, the defendant, and others known and unknown, controlled the bank account into which Victim-1 deposited $4,550.00 and conspired to defraud Victim-1 of the value of Check-1.

10. Based on my review of documents created and mailed to certain of the Victims, my conversations with other law

enforcement officers and other individuals (including Victims), and my review of documents (including bank records, commercial databases, emails, and text messages), and my training and experience, I have learned the following, in substance and in part:

    a.    Before on or about April 6, 2018, Victim-2, an aspiring actress, was contacted via email by an individual purporting to be "Logan Stewart" of the "Excalibur Group."

    b.    Victim-2 was promised an acting job by the individual purporting to be "Logan Stewart" and was provided, via email, with a contract indicating that she would be provided with a check that would serve as an upfront payment for her services as an actress and to be used by a Stylist to assist Victim-2 in obtaining a wardrobe for the acting job.

    c.    On or about April 6, 2018, Victim-2 received via the mail a check for $4,499.99 ("Check-2") from the individual purporting to be "Logan Stewart."

    d.    On or about April 7, 2018, the individual purporting to be "Logan Stewart" contacted Victim-2 via both email and text message and instructed Victim-2: to deposit Check-2 into her personal bank account; to retain $479 of the value of Check-2 in her personal bank account as partial payment for her upcoming acting services; to withdraw the remaining funds (approximately $4,024.99), which were said to be for a Stylist, in cash; and to convert that cash into Bitcoin by depositing it into a Bitcoin wallet ("Wallet-1") at a Bitcoin-ATM in Manhattan, New York, as a means of covering wardrobe expenses.

    e.    On or about April 7, 2018, due to a misunderstanding with the instructions from the individual purporting to be "Logan Stewart," Victim-2 remitted only $500.00 of the cash she had withdrawn against Check-2 into Wallet-1 rather than the entirety of it, leaving her with approximately $3524.99 of the cash she had withdrawn earlier that day.

    f.    On or about April 8, 2018, Victim-2 decided she was no longer interested in working with the individual purporting to be "Logan Stewart" and informed that individual she would prefer to return the money she received from him the day before. Thereafter, the individual purporting to be "Logan Stewart" requested Victim-2 return the remaining cash to him via a variety of methods, including but not limited by transferring

the money to a bank account ("Bank Account-2") in the name of "Nasarawa Transportation" held with a national bank, Bank-2.

   g. On or about March 19, 2018, Bank Account-2 was opened in the Bronx, New York, by a sole proprietorship with Bank-2 in the name of "Nasarawa Transportation," with a business address matching an address identified in government records as the home address of NICHOLAS OFEI COFIE, the defendant, and as having been opened and signed by "Nicholas Ofei Cofie."

   h. Victim-2 never obtained employment from the individual purporting to be "Logan Stewart."

  11. Based on the facts set forth in the preceding paragraph (¶ 10), and my training and experience, I believe NICHOLAS OFEI COFIE, the defendant, is the true accountholder of Bank Account-2.[1]

  12. Based on my review of documents created and mailed to certain of the Victims, my conversations with other law enforcement officers and other individuals (including Victims), and my review of documents (including bank records, commercial databases, emails, and text messages), and my training and experience, I have learned the following, in substance and in part:

   a. On or about December 2, 2018, a male victim ("Victim-3") received an email from an individual purporting to be "Alexander Rodriguez" of "Velar Films" and offering him employment as an actor in a commercial for a healthcare company to be produced by "Velar Films." Victim-3 accepted that offer of employment.

   b. Prior to on or about December 12, 2018, the individual purporting to be "Alexander Rodriguez" further informed Victim-3 that Victim-3 would be provided with a check in the amount of $4,990.00 ("Check-3") that would serve as an upfront payment for Victim-3's services as an actor and to be used by a Stylist to assist Victim-3 in obtaining a wardrobe for the acting job.

   c. Prior to on or about December 12, 2018, Victim-3 received Check-3 in the mail and was instructed by the individual purporting to be "Alexander Rodriguez" to deposit

---

[1] Victim-2 attempted, but ultimately failed, to deposit money into Bank Account-2 despite having been directed by an individual purporting to be "Logan Stewart" to do so.

Check-3 into Victim-3's personal bank account; to retain $500.00 of the value of Check-3 as partial payment for Victim-3's upcoming acting services; to withdraw the remaining funds (approximately $4,490.00), which were said to be for a Stylist, in cash; and to mail the remaining funds ($4,490.00 of cash) to "Thomas Irigoyen" at an address in California in close proximity to an address identified by commercial and government databases as the home address of THOMAS IRIGOYEN, the defendant.

   d. On or about December 12, 2018, after following the instructions provided to him by the individual purporting to be "Alexander Rodriguez," Victim-3 sent via a private commercial interstate carrier an envelope (the "Victim-3 Envelope") containing $4,490.00 in cash to "Thomas Irigoyen" at an address in California in close proximity to an address identified by commercial and government databases as the home address of IRIGOYEN.

   e. On or about December 13, 2018, the Victim-3 Envelope arrived at a location in California in close proximity to an address identified by commercial and government databases as the home address of IRIGOYEN and was signed for by "T. Irigoyen." On or about the same day, Victim-3 was contacted by his personal bank and informed that Check-3 was fraudulent.

   f. Victim-3 never obtained employment from the individual purporting to be "Alexander Rodriguez."

  13. Based on the facts set forth in the preceding paragraph (¶ 12), and my training and experience, I believe that THOMAS IRIGOYEN, the defendant, and others known and unknown, conspired to defraud Victim-3 of the value of Check-3.

  14. Based on my review of documents created and mailed to certain of the Victims, my conversations with other law enforcement officers and other individuals (including Victims), my review of law enforcement records, including complaints made to the New York City Police Department ("NYPD") by Victims, and my review of documents (including bank records, commercial databases, emails, and text messages), I have learned the following, in substance and in part:

   a. Between on or about December 2016 and on or about October 2018, at least approximately 25 victims other than Victim-1, Victim-2, and Victim-3 (that is, "Victim-4 through Victim-29") reported to the NYPD that they had been defrauded by means consistent with the manner by which Victim-1, Victim-2,

and Victim-3 had been defrauded, including but not limited to having received communications containing representations consistent with the False Acting Job Misrepresentations from individuals who purported to work for production companies and offered the Victims an acting or modeling job in a commercial to be produced by such companies.

15. Based on the facts set forth in the preceding five paragraphs (¶¶ 8-14), my participation in this investigation, and my training and experience, I believe the fraudulent scheme perpetrated upon Victim-1, Victim-2, and Victim-3 is the same fraudulent scheme perpetrated upon Victim-4 through Victim-29.

16. Based on my review of documents created and mailed to certain of the Victims, my conversations with other law enforcement officers and other individuals (including Victims), my review of bank records, commercial databases, emails, and text messages, my discussions with representatives of a classifieds acting website ("Website-1") and review of documents and information provided by Website-1, my participation in this investigation, and my training and experience, I have learned the following, in substance and in part:

   a. On or about January 3, 2019, Website-1 sent an email ("Email-1") to its users warning them of a fraudulent scheme being targeted at its users consistent with the False Acting Job Misrepresentations. Email-1 advised users of Website-1 who believed they had been victimized through receipt of the False Acting Job Misrepresentations to contact law enforcement representatives, including me, about the victimization.

   b. Between on or about January 3, 2019, and on or about January 17, 2019, another law enforcement officer and I received emails from approximately 25 users of Website-1 (that is, "Victim-30 through Victim-54") indicating they had received communications containing representations consistent with the False Acting Job Misrepresentations from individuals who purported to work for production companies who offered the users an acting or modeling job in a commercial to be produced by such companies.

17. Based on my review of records maintained by the United States Postal Service ("USPS"), my review of commercial an and government databases, my review of records maintained by the Office of the California Secretary of State, and my training and experience, I have learned the following:

10

a. On or about October 6, 2017, a form (the "Form") registering a limited liability company ("LLC-1") was filed with the Secretary of State of California identifying a business address for LLC-1 matching what commercial and government databases identify as the home address of THOMAS IRIGOYEN, the defendant, and listing IRIGOYEN as the individual, and IRIGOYEN's address as the place, designated to accept service of process on behalf of LLC-1. The Form was signed by "Thomas Irigoyen."

b. On or about October 21, 2017, a "Statement of Information" was filed with the Secretary of State of California by "Thomas Irigoyen" on behalf of LLC-1. The Statement of Information identified a business address for LLC-1 matching what commercial and government databases identify as the home address of IRIGOYEN and identified IRIGOYEN as the managing member and chief executive officer of LLC-1. As with the Form, the Statement of Information identified IRIGOYEN as the individual, and his home address as the place, designated to accept service of process on behalf of LLC-1.

c. On or about October 21, 2017 (the same day the Statement of Information was filed), a shipping account was registered by "Thomas Irigoyen" on behalf of LLC-1 with the United States Postal Service (the "Irigoyen USPS Account").

d. The Irigoyen USPS Account was registered to an address in California that matches what commercial and government databases identify as the home address of IRIGOYEN.

e. The user email address registered to the Irigoyen USPS Account contains components of IRIGOYEN's name, specifically his first initial and last name.

f. Between on or about November 10, 2017, and on or about January 17, 2019, the Irigoyen USPS Account purchased postage for approximately 471 envelopes listing the "Sender Company Name" as one of the companies that I have identified as having "offered" an acting or modeling job to Victims that have had contact with the NYPD and/or Website-1 (as set forth above in ¶¶ 7-16).

18. Based on the foregoing (¶¶ 14-17), and my training and experience, I believe that THOMAS IRIGOYEN, the defendant, with others known and unknown, conspired to send via the mail false and misleading checks from fictitious acting and modeling

11

companies with the intent of defrauding Victims into depositing fake checks into their respective bank accounts, withdrawing money against those fake checks, and transferring the money withdrawn against those fake checks to IRIGOYEN, COFIE, and others known and unknown.

### False Romance Scheme

19. Based on my review of documents created and sent to a victim, Victim-55, my conversations with other law enforcement officers and other individuals (including Victim-55), and my review of documents (including bank records, commercial databases, emails, and text messages), and my training and experience, I have learned the following, in substance and in part:

    a. At all times relevant to the allegations herein related to Victim-55, Victim-55 lived in Texas.

    b. In or about the first half of 2017, an individual purporting to be "Marco Cedric" contacted Victim-55 via an online dating website ("Dating Website-1"). Thereafter, the individual purporting to be "Marco Cedric" and Victim-55 communicated for several months, during which time Victim-55 was led to believe she was initiating a romantic relationship with the individual purporting to be "Marco Cedric."

    c. Beginning in or about October 2017, the individual purporting to be "Marco Cedric" and Victim-55 began communicating via the text messaging function of a social media network and by telephone via a Voice over Internet Protocol service.

    d. On several occasions between in or about December 2017 through in or about July 2018, the individual purporting to be "Marco Cedric" falsely represented to Victim-55 that he needed Victim-55 to send him money via money transfer businesses, wire transfers, and through the purchase of gift cards on the bases that (i) his son needed money, (ii) his bank accounts and/or credit cards had been frozen, (iii) a friend needed money, and (iv) his business needed money.

    e. In response to the false representations made by the individual purporting to be "Marco Cedric" to Victim-55, and at the direction of the individual purporting to be "Marco Cedric," on or about April 24, 2018, Victim-55 wired $25,350.00 from Texas into Bank Account-2, *i.e.*, the bank account opened in

the Bronx, New York, by NICHOLAS OFEI COFIE, the defendant, in the name of "Nasarawa Transportation."

       f.    In response to the false representations made by the individual purporting to be "Marco Cedric" to Victim-55, and at the direction of the individual purporting to be "Marco Cedric," on or about May 17, 2018, Victim-55 wired $42,000.00 from Texas into a bank account ("Bank Account-3") held with a national bank, Bank-3, that was opened on or about February 12, 2018, in Manhattan, New York, in the name of "Nasarawa Transportations" [sic] by "Nicholas Ofei Cofie." As proof of identification when opening Bank Account-3, the accountholder presented a New York State driver's license in the name of "Nicholas Ofei Cofie" bearing the same New York State driver's license number associated with a New York State driver's license issued to COFIE.

       g.    In or about July 2018, Victim-55 confronted the individual purporting to be "Marco Cedric," informed him that she believed he was defrauding her, and asked that he return the money she had transferred at his direction.

       h.    The money deposited into Bank Account-2 and Bank Account-3 (together, $65,350.00) by Victim-55 was never returned to her or reported by COFIE to be have been inadvertently received by him.

    20.    Based on my review of open source Internet materials and a review of filings on the website of the Office of the New York State Secretary of State, I have been unable to locate any website associated with "Nasarawa Transportation," any description of the business transacted by "Nasarawa Transportation," or any address for an office or place of business for "Nasarawa Transportation."

    21.    Based on the facts set forth in the preceding two paragraphs (¶¶ 19-20), I believe that NICHOLAS OFEI COFIE, the defendant, defrauded Victim-55 into wiring Bank Account-2 and Bank Account-3 approximately $65,350.00.

[Intentionally left blank]

WHEREFORE, the deponent respectfully requests that warrants be issued for the arrests of THOMAS IRIGOYEN and NICHOLAS OFEI COFIE, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
ANTHONY NAPOLI
Detective
New York City Police Department

Sworn to before me this
23d day of January, 2019

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK